AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

| | | |
|---|---|---|
| United States of America<br>v.<br>Joshua Barrett Hoskins, John James Fenimore, Michael T. Dignelli, Sr., John F. Macpherson and Garry Anthony Brown,<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>) | Case No. 12-8305-WM |

FILED by _____ D.C.
JUL 3 1 2012
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __December 2008 - March 2010__ in the county of _____Palm Beach_____ in the __Southern__ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. SECTION 1349 | The defendants knowingly and willfully conspired and agreed together and with each other, and with other persons known and unknown, to commit mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343. |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Paul R. Hollinger, Special Agent, F.B.I.
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __07/31/2012__

_____
*Judge's signature*

City and state: ____West Palm Beach, Florida____

WILLIAM MATTHEWAM, U.S. MAGISTRATE JUDGE
*Printed name and title*

**AFFIDAVIT**

A. INTRODUCTION

I, Paul R. Hollinger, having first been duly sworn, do hereby state the following:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice. I have been so employed for over seven years. In that time I have worked on several complex fraud investigations. I am currently assigned to the Miami Division's Palm Beach Office of the FBI. My duties include the investigation of violations of mail fraud, wire fraud, and other sophisticated fraud schemes. Through my experience in the course of these investigations, I have become familiar with telemarketing fraud. I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United states Code (USC), 2510 (7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, USC 1349.

2. The following information is based on my personal knowledge, discussions with City of Boca Raton Police Department detectives, information provided by cooperating defendants, and the review of documentary evidence. Where the statements of others are referenced, they are related in substance and are not verbatim. This Affidavit is being submitted solely to establish probable cause to believe that defendants JOSHUA BARRETT HOSKINS, JOHN JAMES FENIMORE, MICHAEL T. DIGNELLI, SR., JOHN F. MACPHERSON, and GARRY ANTHONY BROWN have conspired to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349. This affidavit therefore does not contain all of the

1

information known to affiant or other law enforcement agents participating in the investigation concerning the offense.

**B.     FACTS**

3.     Between December 2008 and March 2010, defendants JOSHUA BARRETT HOSKINS, JOHN JAMES FENIMORE, MICHAEL T. DIGNELLI, SR., JOHN F. MACPHERSON, and GARRY ANTHONY BROWN and others were engaged in a telemarketing scheme, operating under various names such as Transatlantic Timeshares, LLC.; Euroamerican Timeshares, LLC.; E.A.T. Sales, LLC.; National Timeshare Liquidators, LLC.; NTL, LLC.; and Real Estate Purchasing Syndicate, LLC.  These and similarly named companies engaged in a telemarketing scheme using boiler rooms located in Boynton Beach and Boca Raton, Florida.  The scheme targeted timeshare owners throughout the United States and Canada but conspicuously avoided victim owners located in Florida.  The scheme involved false and fraudulent representations and promises that the companies were going to purchase the victim's timeshare. They further falsely represented that they were financially prepared to purchase the victim's timeshare or had arranged to sell the victim's timeshare to another buyer.  The sale was on condition that the victim owner paid to them up-front fees of as much as several thousand dollars for closing costs, title and deed searches, and other related expenses.  These fees were falsely promised to be maintained in an escrow account and the victims were falsely told that the money would be returned to the victim at the sale of the timeshare.  The scheme also solicited the timeshare owner to sell their unused ("banked") vacation weeks for thousands of dollars if the victim paid them various additional up-front fees.

4.     The timeshare owners were initially contacted via telephone by telemarketers holding a position referred to in the industry as "openers" and/or "fronters."

2

The victims were identified from "lead sheets" procured from other telemarketing businesses. The "opener" would attempt to entice the timeshare owner in the "sale" of their timeshare to the business. Once interested, the victim would be forwarded to a "closer." The "closer" was responsible for negotiating the purported purchase of the timeshare on behalf of the business. The "closer" would discuss the terms of the contract, such as the purchase price of the timeshare, the initial up-front fees the victim would pay and the purported closing date. The "closer" would then cause the purported contract to be e-mailed, mailed, and/or faxed to the timeshare owner. The timeshare owner would be instructed by the "closer" to mail or transmit the up-front fees to the business and to obtain a confirmation number from the mail carrier. The victims were routinely told that the closing was to occur in merely a few weeks after they mailed in their fees.

5. The defendants and other co-conspirators used fictitious names when transacting business with the victims. Moreover, to lend an air of legitimacy, defendants HOSKINS, and FENIMORE, as well as others, would falsely identify themselves to the victims as the "Director of Sales." During the course of the scheme, some of the telemarketers would tell the victims that their business was using Royal Title Services, which was actually a fictitious company created by co-conspirators. In some instances, telemarketers referenced a real title company and falsely told the victims that they were using that company for title work when in fact no title work was ever performed.

6. The conspirators frequently changed the name of the company after just a few months. This change of name aided their evasion of law enforcement scrutiny and assisted the conspirators in furthering the scheme. Oftentimes after the company name changed, victim owners were re-solicited for additional up-front fees by the telemarketers under the new

3

company name. The conspirators would falsely claim to the victims that the old company had closed and that this new company was going to move forward with the purchase. However, the new company required additional up-front fees to proceed. As an inducement, they would falsely tell the victims that the victims would be credited with the fees that they had paid to the previous company. No refunds were ever provided to any victim.

7. There were neither closings nor purchases of any timeshares as promised by the telemarketers in their telephone calls and contracts. Virtually all of the money received by the scheme was pocketed by the organizers and telemarketers. The individual telemarketers who sold the timeshares received approximately one-third of the solicited funds, and the balance was kept by the organizers of the fraud.

8. Between February 2009 and March 2010, defendant JOSHUA BARRETT HOSKINS functioned as a "closer" in the above-described scheme. Defendant HOSKINS, using an alias, contacted numerous timeshare owners representing to them that his "company" had an interest in purchasing their timeshare. When acting as a "closer," defendant HOSKINS, by telephone and email, negotiated the amount of money the victim would have to send for up-front costs before the company would "purchase" the victim's timeshare. Periodically, Defendant Hoskins would re-contact victims and solicit additional up-front fees from them, claiming they had unused banked weeks with monetary value. Defendant HOSKINS used the following fictitious names when conducting business with the victims: Barry Mercer, Sean Forrest, John Mark Wilson, and Willie Caldwell. On or about November 30, 2009, Defendant HOSKINS, using the alias "Willie Caldwell," telephonically contacted victims M.H. and A. H. of California in reference to their unused timeshare weeks. Defendant HOSKINS induced victims M.H. and A. H. into believing that he would purchase the unused weeks for $24,000.00. Defendant HOSKINS told these

4

victims that an up-front fee in the amount of $3,200.00 was needed in order to complete the purchase. On or about November 30, 2009, Defendant HOSKINS caused M.H. and A. H. to mail, via U.S. Postal Service, a check in the amount of $3,200.00 to National Timeshare Liquidators in Boca Raton, Florida. Defendant HOSKINS received approximately $326,054.00 from his fraudulent timeshare activities.

9. Between January 2009 and March 2010, defendant JOHN FENIMORE functioned as an "opener" and "closer" in the above-described scheme. Defendant FENIMORE, using an alias, contacted numerous timeshare owners representing to them that his "company" had an interest in purchasing their timeshare. When acting as a "closer," defendant FENIMORE, by telephone and email, negotiated the amount of money the victim would have to send for up-front costs before the company would "purchase" the victim's timeshare. Defendant FENIMORE used the fictitious name "John Reynolds" when conducting business with the victims. On or about June 2009, victim C.D. of Kentucky was contacted several times telephonically by Defendant FENIMORE, using the alias "John Reynolds," on behalf of E.A.T. Sales in Boca Raton, Florida regarding the purchase of his timeshare. On or about July 7, 2009, victim C.D. received an email from "John Reynolds" with an offer to purchase the timeshare. The email provided C.D. with information related to the purported timeshare purchase such as sale price, closing costs, closing date, and a guarantee that if the purchase did not occur within 24 days, E.A.T. Sales would refund any and all costs associated with the purchase. As a result of the email and phone calls from FENIMORE, victim C.D. mailed a check in the amount of $1,400.00, via U.S. Postal Service, to E.A.T. Sales in Boca Raton, Florida, for a title search of the timeshare. On July 23, 2009, C.D. received an email confirmation from Defendant FENIMORE advising C.D. that C.D.'s $1,400.00 had been "secured" and would be returned to

5

C.D. at the time of closing. No closing ever occurred and no money was ever refunded to C.D. Defendant FENIMORE received approximately $304,124.00 from his fraudulent timeshare activities.

10.     Between May 2009 and February 2010, Defendant MICHAEL T. DIGNELLI, SR. functioned as an "opener" and "closer" in the above-described scheme. Defendant DIGNELLI, using an alias, contacted numerous timeshare owners representing to them that his "company" had an interest in purchasing their timeshare. When acting as a "closer," Defendant DIGNELLI, by telephone, negotiated the amount of money that the victim would have to send for up-front costs before the company would "purchase" the victim's timeshare. Defendant DIGNELLI used the following fictitious names when conducting his purported timeshare purchasing activities: George Leon and Mark Roberto. On or about January 2010, Defendant DIGNELLI, using the alias "George Leon" on behalf of NTL, LLC. in Boca Raton, Florida telephonically contacted victim G.K. of Ohio regarding the purchase of a timeshare. Defendant DIGNELLI induced victim G.K. into believing he would purchase G.K.'s timeshare and banked weeks for $21,985.00 by signing a sales contract and sending it to G.K. in Ohio. Defendant DIGNELLI told G.K. that an up-front fee in the amount of $1,306.00 was needed in order to move forward with the purchase. On or about January 22, 2010, G.K. sent, via U.S. Postal Service Certified Mail, a package to NTL containing a signed purchase contract and a check in the amount of $1,306.00 for the purported sale of his timeshare. No timeshare purchase ever actually occurred and the victim never received a refund. When interviewed, Defendant DIGNELLI admitted his involvement in the scheme as described above. Defendant DIGNELLI received approximately $26,975.00 from his fraudulent timeshare activities.

11. Between January and February 2009, Defendant JOHN F. MACPHERSON functioned as an "opener" and "closer" in the above-described scheme. When acting as the "opener", Defendant MACPHERSON contacted numerous timeshare owners representing to them that his "company" had an interest in purchasing their timeshare. Defendant MACPHERSON attempted to entice timeshare owners to "sell" their timeshares to the business. During an interview, Defendant MACPHERSON admitted to Affiant that he would forward his leads to either Defendant FENIMORE or Defendant HOSKINS, who were "closers" in the above described scheme. Defendant MACPHERSON also admitted to acting as a "closer" in the scheme. When acting as a "closer," Defendant MACPHERSON said he would contact victims by telephone, and negotiate the amount of money that the victim would have to send for up-front costs before the company would proceed with the purported "purchase" of the victim's timeshare. Defendant MACPHERSON admitted that he knew this was a fraud; MACPHERSON knew his company was not actually purchasing timeshares from the victims nor did the company have buyers on stand-by waiting to purchase the timeshares. Record checks reflect that Defendant MACPHERSON was named as a corporate officer in the corporate documents for the companies Transatlantic Timeshares, LLC. and Euroamerican Timeshares, LLC. Furthermore, Defendant MACPHERSON was identified as a corporate officer for a company known as Hawkeye Title, LLC. Defendant MACPHERSON admitted he established the corporation, Hawkeye Title, LLC., along with Defendant FENIMORE to use as a prop to bolster the legitimacy of their timeshare fraud scheme. Defendant MACPHERSON admitted that he continued to conduct fraudulent timeshare telemarketing activities even after he was approached by Affiant. Defendant MACPHERSON received approximately $7,711.00 from his fraudulent timeshare activities.

12. Between August 2009 and November 2009, Defendant GARRY ANTHONY BROWN functioned as both an "opener" and a "closer" in the above-described scheme. When acting as the "opener," Defendant BROWN contacted numerous timeshare owners representing to them that his "company" had an interest in purchasing their timeshare. When acting as a "closer," Defendant BROWN, by telephone, negotiated the amount of money the victim would have to send for up-front costs before the company would purportedly "purchase" the victim's timeshare. Defendant BROWN used the fictitious name "Dick Oldman" when dealing with the victims. On or about September 1, 2009, Defendant BROWN, using the alias "Dick Oldman" working on behalf of E.A.T. Sales, LLC. in Boca Raton, Florida telephonically contacted victims G.K. and K.K. of Arkansas in reference to the purchase of their timeshare property. Defendant BROWN induced victims G.K. and K.K. into believing he would purchase their timeshare for $2,400.00 by signing a sales contract and sending it to G.K. in Arkansas, via faxsimile, on or about September 2, 2009. Defendant BROWN told G.K. and K.K. that he required a "fully refundable" up-front security deposit from them in the amount of $3,000.00 in order to move forward with the purchase. G.K. and K.K. were informed by Defendant BROWN that they could send the deposit check to him via FedEx and he would arrange to have FedEx come to their house for the pick-up. On or about September 3, 2009, G.K. and K.K. sent, via FedEx, a package to E.A.T. Sales containing a check in the amount of $3,000.00 for the purported sale of their timeshare. No timeshare sale ever actually took place and the victims never received a refund. Defendant BROWN received approximately $32,205.00 from his fraudulent timeshare activities.

13. Based upon review of financial records it has been determined that the above-described scheme generated revenues in excess $2.6 million dollars.

8

C. **CONCLUSION**

14. Based on the foregoing there is probable cause to believe that defendants JOSHUA BARRETT HOSKINS, JOHN JAMES FENIMORE, MICHAEL T. DIGNELLI, SR., JOHN F. MACPHERSON, and GARRY ANTHONY BROWN did knowingly and willfully conspire to commit mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343; all in violation of Title 18, United States Code, 1349.

FURTHER YOUR AFFIANT SAYETH NAUGHT

_____
Paul R. Hollinger, Special Agent, FBI

Sworn to before me this

31st day of July, 2012

_____
WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 12-8305-WM

UNITED STATES OF AMERICA

vs.

JOSHUA BARRETT HOSHKINS,
JOHN JAMES FENIMORE,
MICHAEL T. DIGNELLI, SR.,
JOHN F. MACPHERSON and
GARRY ANTHONY BROWN,

        Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

        Respectfully submitted,

        WIFREDO A. FERRER
        UNITED STATES ATTORNEY

BY: _____
        Kerry Baron
        Assistant United States Attorney
        Florida Bar No. A5500040
        500 S. Australian Avenue, Suite 400
        West Palm Beach, FL 33401
        TEL: (561) 820-8711
        FAX: (561) 805-9846